IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PAMELA J. HARRIS, ELLEN BRONFELD, CAROLE GULO, MICHELLE HARRIS, WENDY PARTRIDGE, THERESA RIFFEY, GORDON P. STIEFEL, SUSAN WATTS, PATRICIA WITHERS, STEPHANIE YENCER-PRICE, and a class of similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>GOVERNOR PAT QUINN, in His Official Capacity as Governor of the State of Illinois, SEIU HEALTHCARE ILLINOIS & INDIANA, SEIU LOCAL 73, and AFSCME COUNCIL 31,<br><br>    Defendants. | No. 10-cv-02477<br><br>Hon. Sharon Johnson Coleman |

## MEMORANDUM OPINION AND ORDER

In this proposed class action lawsuit, Plaintiffs are individuals who provide in-home care to disabled participants in one of two Illinois Medicaid-waiver programs: (1) the Home Services Program administered by the Division of Rehabilitation Services of the Illinois Department of Human Services ("Rehabilitation Program"); or (2) the Home Based Support Services Program for Mentally Disabled Adults administered by the Division of Developmental Disabilities of the Illinois Department of Human Services ("Disabilities Program"). Plaintiffs Theresa Riffey, Susan Watts, and Stephanie Yencer-Price ("Rehabilitation Plaintiffs") provide services to disabled participants in the Rehabilitation Program and allege that Defendant SEIU Healthcare Illinois & Indiana ("SEIU HII") violated the constitutional rights of these Plaintiffs by compelling them to pay SEIU HII compulsory union fees. Plaintiffs Pamela J. Harris, Ellen

Bronfeld, Michelle Harris, Carole Gulo, Wendy Partridge, and Patricia Withers ("Disabilities Plaintiffs")[1] provide services to disabled participants in the Disabilities Program. The Disabilities Plaintiffs allege that Defendants Governor Pat Quinn ("Governor Quinn"), SEIU Local 73, and AFSCME Council 31 ("AFSCME") violated the constitutional rights of the Disabilities Plaintiffs by threatening to compel them to financially support either SEIU Local 73 or AFSCME. The Rehabilitation Plaintiffs and the Disabilities Plaintiffs seek monetary damages, injunctive relief, and a declaratory judgment that certain conduct, portions of two Illinois Executive Orders, and an Illinois Public Act are unconstitutional. In a consolidated motion, all Defendants moved for dismissal of Counts I and II pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1) respectively. (Dkt. No. 30.) Defendants SEIU Local 73 and AFSCME moved for dismissal on the additional basis that the claims against them fail to establish state action. Governor Quinn moved for dismissal of any claim seeking monetary damages against him on the additional basis of the immunity protections provided by the Eleventh Amendment. The Court conducted a hearing on the pending motion on November 5, 2010. For the reasons stated below, the Court grants Defendants' Consolidated Motion to Dismiss.

**I.     Factual Background**

The Plaintiffs are providers of home care service to disabled individuals enrolled in either the Disabilities Program or the Rehabilitation Program.[2] (Dkt. No. p. 2.) Both programs are

---

[1] Plaintiffs have filed notice with the Court of the voluntary dismissal of Gordon P. Stiefel. (Dkt. No. 49.)

[2] Providers in the Rehabilitation Program are generally referred to as "personal assistants" while providers in the Disabilities Program are generally referred to as "individual providers."

2

Medicaid-waiver programs administered by the Illinois Department of Human Services, which subsidize the costs of providing home-based services to individuals with severe disabilities. (*Id.* at ¶¶ 7, 13.) The Plaintiffs provide personal care and certain health care services to program participants to allow the participants to remain in their homes and prevent their unnecessary institutionalization. (*Id.*) The program participants may select and hire any provider who meets certain minimum requirements as set by the State of Illinois ("State"). (Compl. ¶¶ 10, 16.) The participants supervise, discipline, and control certain terms and conditions of the providers they hire. (*Id.*) The State subsidizes a participant's cost of hiring a provider, ensures that providers meet certain minimum requirements, and controls the economic terms of the providers' employment. (Compl. ¶¶ 10-11, 17.)

### A. Providers in The Rehabilitation Program

In March 2003, former Illinois Governor Blagojevich issued "Executive Order on Collective Bargaining By Personal Assistants" ("EO 2003-08"), which recognized that the State was not the "sole employer" of the personal assistants who provide home services under the Rehabilitation Program. (Dkt. No. 32-1.) EO 2003-08 also recognized the importance of preserving the participants' "control over the hiring, in-home supervision, and termination of the personal assistants" while at the same time preserving the "State's ability to ensure efficient and effective delivery of personal care services and [to] control the economic terms of the personal assistants' employment." (*Id.*) In recognition of these twin objectives, EO 2003-08 provided that the State shall recognize a representative designated by the majority of the personal assistants as the exclusive representative of all personal assistants for the purposes of engaging

---

(Dkt. No. 1 ¶¶ 9, 31.)

in collective bargaining with the representative concerning the terms and conditions of employment "that are within the State's control." (*Id.*; Compl. ¶ 20.)

In July 2003, the Illinois General Assembly codified EO 2003-08 by enacting Public Act 0903-204, An Act Concerning Disabled Persons ("the 2003 Act"), which amended Section 3 of the Disabled Persons Rehabilitation Act. (Compl. ¶ 21; Dkt. No. 32-10.) Section 3(f) of the 2003 Act provided:

> [P]ersonal assistants providing services under the Department's Home Services Program shall be considered to be public employees and the State of Illinois shall be considered their employer. (Dkt. No. 32-10.)

The 2003 Act also provided for a "Fair share agreement" which required all employees in a collective bargaining unit to pay "their proportionate share of the costs of the collective bargaining process, contract administration, and pursuing matters affecting wages, hours, and other conditions of employment." (*Id.* at Sect. 3(g).) The fair share agreement specifically excluded payment of "any fees for contributions related to the election or support of any candidate for political office." (*Id.*)

Shortly after the 2003 Act was enacted, the majority of personal assistants in the Rehabilitation Program designated SEIU HII as the exclusive representative for all personal assistants and the State and SEIU HII subsequently entered into a collective bargaining agreement ("CBA") effective August 1, 2003 to December 31, 2007. (Compl. ¶¶ 22-24.) In 2008, the State and SEIU HII entered into a new CBA effective January 1, 2008 to June 30, 2012. (*Id.* at ¶ 24; Dkt. No. 32-3 p. 2.) The CBA allows the State, upon the written authorization of the personal assistant, to deduct union dues and initiation fees from the personal

4

assistant's wages and remit such fees to SEIU HII. (Dkt. No. 32-3 p. 8.) The CBA also contains a fair share provision in Section 6 of Article X, which tracks the language in the 2003 Act and requires that all personal assistants who are not SEIU HII members pay "their proportionate share of the costs of the collective bargaining process, contract administration and pursuing matters affecting wages, hours, and other conditions of employment." (Compl. ¶ 25; Dkt. No. 32-4 p. 7.)

The Rehabilitation Plaintiffs are personal assistants in the Rehabilitation Program who have either paid union dues or fair share fees through payroll deductions that were ultimately remitted to SEIU HII. (Compl. ¶ 38.) The Rehabilitation Plaintiffs allege that they, and other similarly situated personal assistants, are compelled to financially support SEIU HII for purposes of speaking to, petitioning, and otherwise lobbying the State with respect to the Rehabilitation Program and that the compelled association abridges their right to freedom of association, freedom of speech, and to petition the government for redress of grievances under the First Amendment to the United States Constitution, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983. (Compl. ¶ 46.)

### B. Providers in the Disabilities Program

On June 29, 2009, Governor Quinn issued Executive Order 2009-15 ("EO 2009-15" or "the Order") titled "Collective Bargaining By Individual Providers of Home-Based Support Services." (Compl. ¶ 31; Dkt. No 32-2.) EO 2009-15 recognized that the individual providers of home-based services under the Disabilities Program are not State employees but that the "State controls the economic terms of their provision of services." (Dkt. No. 32-2 p. 2.) The Order also recognized the fact that the State had productively dealt with an exclusive

5

representative of personal assistants in the Rehabilitation Program for many years. (*Id.*) EO 2009-15 authorized the State to recognize a representative designated by the majority of the individual providers in the Home-Based Support Services Program as the exclusive representative for collective bargaining purposes. (Compl ¶ 31.)

In October 2009, Defendants SEIU Local 73 and AFSCME unsuccessfully attempted to become the exclusive representative of the individual providers in the Disabilities Program. (*Id.*. ¶ 32.) As a result, the individual providers in the Disabilities program are not represented by any union. (*Id.* at 33.) The Disabilities Plaintiffs allege that they devoted time, and in some cases money, to campaign against union representation. (*Id.* at 35.) These Plaintiffs also allege that SEIU Local 73 and AFSCME are continuing their efforts to become the exclusive representative pursuant to EO 2009-15 and that these ongoing efforts threaten to violate the constitutional rights of the Disabilities Plaintiffs and others similarly situated. (*Id.* at ¶¶ 36-37.)

## II.     Standard of Review

### A.     Motion To Dismiss for Failure To State a Claim

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. *Christensen v. County* of Boone, 483 F.3d 454, 458 (7th Cir. 2007). Pursuant to the federal notice pleading standard, a complaint need only provide a short and plain statement of the claim showing that the plaintiff is entitled to relief and sufficient to provide the defendant with fair notice of the claim and its basis. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). When evaluating the sufficiency of a complaint, a district court must construe the complaint in the light most favorable to the nonmoving party. *Id.* The Supreme Court has described the bar that a complaint must clear for purposes of Rule 12(b)(6) as

follows: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). For a claim to have facial plausibility, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. As such, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A Rule 12(b)(6) motion must be decided solely on the face of the complaint and any attachments that accompanied its filing. *Miller v. Herman*, 600 F.3d 726, 732 (7th Cir. 2010). Pursuant to Federal Rule of Civil Procedure 12(d), a district court cannot consider material outside of the complaint and its attachments without converting a Rule 12(b)(6) motion to a motion for summary judgment. *See* Fed. R. Civ. P 12(d) ("[i]f on motion under Rule 12(b)(6) or 12©), matters outside of the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment"). A court may, however, consider judicially noticed documents without converting a motion to dismiss into a motion for summary judgment. *Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998). Judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper. *Id.*; *see also* Fed. R. Evid. 201.

### B. Motion to Dismiss for Lack of Subject Matter Jurisdiction

When reviewing a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, a district court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir.

1999). The district court is not, however, bound to accept as true the allegations of the complaint which tend to establish jurisdiction where an opposing party properly raises a factual question concerning the jurisdiction of the district court to proceed with the action. *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir. 1979). The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists. *Long*, 182 F.3d at 554.

### C. Request for Judicial Notice

Documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the complaint and are central to the claims. *Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998). Defendants requested that the Court take judicial notice of ten documents in support of their motion to dismiss. (Dkt. No. 32.) Plaintiffs do not oppose Defendants' request for judicial notice and indeed the Complaint relies upon several of the documents presented by the Defendants in their request for judicial notice. (*See* Dkt. No. 1 ¶¶ 20, 21, 24, 31.) The Court therefore takes judicial notice of the following documents because they are matters of public record and because they are central to Plaintiffs' claims: (1) Executive Order No. 2003-8 (Defendants' Request for Judicial Notice ("RJN"), Ex. A); (2) Executive Order No. 2009-15 (*id.* at Ex. B); (3) Collective Bargaining Agreement between SEIU HII and the State of Illinois effective January 1, 2008 to June 30, 2012 (*id.* at Ex. C); (4) Collective Bargaining Agreement between SEIU HII and the State of Illinois effective August 1, 2003 to December 31, 2007) (*id.* at Ex. D); and (5) Illinois Public Act 93-0204 (2003) (*id.* at Ex. J). The Court also takes judicial notice of the August 30, 2002 Order in *West v. Serv. Employees Int'l Union Local 434B* in the United States District Court for the Central Division of California,

Western Division, (*id.* at Ex. F). *See, e.g., Opoka v. INS*, 94 F.3d 392, 394 (7th Cir. 1996) ("it is a well-settled principle that the decision of another court or agency...is a proper subject of judicial notice"). The Court declines to take judicial notice of the April 11, 2009 Arbitration Decision (RJN, Ex. E), the December 18, 1985 decision of the Illinois State Labor Relations Board (*id.* at Ex. G), the April 23, 2007 decision of the Illinois Labor Board (*id.* at Ex. H), and the March 18, 2002 decision of the State of Illinois Industrial Commission (*id.* at Ex. I) because Defendants have not established that these documents are necessary for resolution of their motion.

### III. Analysis

#### A. Count I - Rehabilitation Plaintiffs

Count I, asserted on behalf of the Rehabilitation Plaintiffs, alleges the system of exclusive representation established by the State that allows Defendant SEIU HII to impose and collect fair share fees violates the Plaintiffs' First Amendment rights. Defendants move for dismissal of Count I alleging that the U.S. Supreme Court has held that collective bargaining arrangements permitting fair share fees are consistent with the First Amendment. (Dkt. No. 31 p. 13.) Defendants claim that a long and unbroken line of Supreme Court cases about collective bargaining have held that such arrangements are justified by the state's legitimate interest in establishing a harmonious system for labor relations. (*Id.*) Defendants also argue fair share fees have been found to fairly distribute the costs associated with collective bargaining among all who benefit to avoid the risk of "free riders." (*Id.*) Defendants rely upon *Hanson* and its progeny for the proposition that exclusive representation arrangements, while imposing some burden on an individual's First Amendment rights, are justified by the employer's interest in

9

"labor peace." *Railway Employees' Dep't. v. Hanson*, 351 U.S. 225, 238 (1961) (holding "the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work" does not violate the First Amendment)*; Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 222 (1977) (holding fair share fees used to finance expenditures germane to collective bargaining serve an important government interest in labor relations and are constitutionally justified); *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 522 (1991) (holding that a union could constitutionally charge dissenting employees for their share of union activities appurtenant to collective bargaining and contract implementation). Defendants find additional support in a recent decision dismissing a similar action on nearly identical facts. (Order Granting SEIU Local 434B's Motion to Dismiss Counts One Through Four, *West v. Serv. Employees Int'l Union Local 434B*, No. 01-cv-10862-CAS-FMO (C.D. Cal. Aug. 30, 2002), submitted as RJN, Ex. F.)

As noted by the Defendants, the Supreme Court has held that employees can be required to contribute fair share fees to compensate unions for their representational activities. *See, e.g.*, *Lehnert*, 500 U.S. at 519. A line is drawn for First Amendment purposes between fair share fees, which pay for representational or collective-bargaining activities, and full union dues that often support nonrepresentational activities. Unions cannot force employees to pay for "the support of ideological causes not germane to its duties as collective-bargaining agent." *See Abood*, 431 U.S. at 235-36; *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 294, 89 L. Ed. 2d 232, 106 S. Ct. 1066 (1986). In a recent decision, the Seventh Circuit explained that fair share fees are permitted under the First Amendment because this forced speech promotes peaceful labor relations and serves legitimate government purposes for the benefit of both union members and non-members. *Kingstad v. State Bar of Wisc.*, No. 09-4080 (7th Cir. Sept. 9, 2010) (slip opinion

pp. 10-11). Without a showing that fair share fees are used to fund ideological conformity or imposed for reasons unrelated to collective bargaining, these fees do not violate the First Amendment. *Hanson*, 351 U.S. at 235-38.

Plaintiffs do not deny that fair share fees in the collective bargaining context have been found constitutional. Rather, Plaintiffs argue that the exclusive representation arrangement here is "nothing short of compulsory political representation" that violates Plaintiffs' First Amendment rights by compelling them to support a state-designated entity for purposes of lobbying the State for additional benefits from a government program. (Dkt. No. 33 at pp. 9-10.) Plaintiffs also allege that fair share fees imposed under this arrangement are not justified by a vital government interest.

The Plaintiffs' claim that they are compelled by the State to support a state-designated representative to speak on their behalf for the purpose of getting more benefits from a government program is unsound. First, the State did not designate any entity to serve as the Plaintiffs' exclusive representative. Instead, as set forth in the Complaint, the State "recognize[d] a representative designated by a majority of the personal assistants as the exclusive representative of all personal assistants." (Dkt. No. 1 ¶ 20.) Second, the Complaint alleges that the disabled individuals, not the Plaintiffs, are the recipients of a government program that subsidizes the cost of their in-home care. (Dkt. No. 1 ¶¶ 2-3, 7, 13.) Third, the Complaint is bereft of any allegation that the Plaintiffs are prevented from independently lobbying the State for any purpose. Finally, the authorities that Plaintiffs cite to support their claim found compelled support of beliefs or ideology unconstitutional; this is not the case that

Plaintiffs find themselves in.³  *See, e.g.*, *Rutan v. Republican Party*, 497 U.S. 62, 74-75 (1990) (holding any personnel decisions based upon support of political party violate First Amendment); *Abood*, 431 U.S. at 233-34 (holding union fees that support ideological activities violate First Amendment); *Elrod v. Burns*, 427 U.S. 347, 356-57 (1976) (holding policy that conditions employment on support of a political party violates First Amendment).

Defendants contend the State's legitimate interest in establishing effective collective bargaining justifies a system of exclusive representation and fair share fees.  (Dkt. No. 31. p. 17.) Plaintiffs counter that such arrangements are only constitutional when justified by a vital government interest and that none exists here.  (Dkt. No. 33. p. 11.)  Plaintiffs once again rely upon *Elrod* and *Rutan*, both of which considered infringements on First Amendment rights outside of the collective bargaining environment.

Plaintiffs also claim *Lehnert* provides support for their claim.  Plaintiffs' reliance upon *Lehnert,* however, is puzzling.  The *Lehnert* plaintiffs were employees of a state college who challenged compelled union fees that were used for purposes *other* than collective bargaining. 500 U.S. at 513.  In addressing plaintiffs' challenge, the Court first emphasized that its previous decisions recognized that the compelled financial support of a union's collective bargaining

---

³Plaintiffs filed a Citation to Supplemental Authorities in Support of Their Opposition to Defendants' Motion to Dismiss (Dkt. No. 39) after the close of briefing on the instant motion and without seeking leave of the Court.  The filing consisted of a July 14, 2010 Order in *Schlaud v. Granholm*, Case No. 10-cv-147 (Dkt. No. 32) pending in the United States District Court for the Western District of Michigan, along with excerpts from a July 13, 2010 hearing in the same matter.  No reasoning was included in the July 14, 2010 Order.  During the November 5, 2010 hearing in the case *sub judice*, Plaintiff's counsel conceded that he speculated as to the district court's reasoning in *Schlaud*.  The Court declines to speculate about the court's reasoning in *Schlaud* and thus the Court will not consider this supplemental filing in ruling on Defendants' Consolidated Motion to Dismiss.

activities was constitutionally permissible. *Id.* at 516. The Court then articulated a three prong test for determining the range of fees that a union could constitutionally charge non-members consistent with the First Amendment. *Id.* at 519. Plaintiffs quote from a portion of this test when arguing that the State must demonstrate that a vital interest, rather than a legitimate interest as Defendants assert, justifies the fair share fees at issue here. (Dkt. No. 33 p. 11.) The full test set forth in *Lehnert* provides:

> [A]lthough the Court's decisions in this area prescribe a case-by-case analysis in determining which activities a union may constitutionally charge to dissenting employees, they also set forth several guidelines to be followed in making such determinations...chargeable activities must (1) be "germane" to collective-bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding "free riders"; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop.

*Lehnert,* 500 U.S. at 519. Read in full context, *Lehnert* explains that the government's interest in labor peace and avoiding free riders is a vital government interest. While Defendants may have characterized the State's interest in establishing a harmonious system for labor relations as a legitimate interest, this interest is considered vital in accordance with Supreme Court precedent. Plaintiffs' claim that no vital interest exists here lacks merit.

Throughout the hearing, Plaintiff's counsel repeatedly referred to the collective bargaining activities before the Court as "lobbying." Counsel argued that collective bargaining absent an employer-employee relationship is lobbying and that since no employment relationship exists between the State and the personal assistants in the Rehabilitation Program, that the fair share fees here support compulsory lobbying. This argument is flawed as the Complaint alleges

that: (1) the State pays the providers (Dkt. No. 1 ¶¶ 11, 26); (2) the State controls certain terms and conditions of the providers' employment (*id.* at ¶¶ 10-11, 22, 26); and (3) the 20,000 providers are considered State employees solely for the purpose of collective bargaining (*id.* at ¶¶ 12, 21).

Although Plaintiff's counsel provided no authority to support this argument, *Lehnert* provides guidance on the sometimes "hazy line" between lobbying and collective bargaining in the public sector. *Lehnert*, 500 U.S. at 518-520. The Court explained that in public sector employment, unions must necessarily concern themselves not only with negotiations at the bargaining table but also with those activities necessary to ensure the agreement's implementation. *Id.* at 520. These additional activities include efforts to secure ratification and acquire appropriations from the proper state body. *Id.* These post-negotiating activities are "pertinent to the duties of the union as a bargaining representative" and are an "indispensable prerequisite" to ensuring contract implementation. *Id.* at 519-520. The Court recognized that the question of whether these additional activities are lobbying is "a close one." *Id.* at 520. The Court held, however, that employees may be constitutionally compelled to subsidize legislative lobbying within the context of contract ratification or implementation. *Id.* at 522. Thus, characterizing the fair share fees here as "compulsory lobbying" does not, without more, implicate any First Amendment concerns. *Id.* at 517.

Plaintiffs' also claim that the labor peace justification does not apply here because the personal assistants are not State employees. Yet, the personal assistants have been designated as public employees for the purpose of collective bargaining. (Dkt. No. 1 ¶ 19.) There can be no doubt that the State has a vital interest in establishing peaceful labor relations with the 20,000

14

personal assistants paid with State subsidized funds. Plaintiffs next argue that First Amendment values should predominate over the State's interest because a contrary approach would inflict harm by causing individuals to support views and beliefs against their will thereby harming the democratic process that the First Amendment protects. (Dkt. No. 33 p. 36.) Plaintiffs' argument fails because they have not alleged either in the Complaint or in their Opposition Motion that Plaintiffs have been forced to support any ideology or viewpoint with which they disagree.

In their briefs, both Plaintiffs and Defendants refer to the order entered by the district court in *West v. SEIU Local 434B*. Defendants argue that *West* supports their claim that the system of collective bargaining established by the State of Illinois comports with the First Amendment while the Plaintiffs argue that *West* rests on faulty reasoning. (Dkt. No. 31 p. 26; Dkt. No. 33. p. 34.) While certainly not binding on this Court, we find the reasoning in *West* persuasive. The *West* plaintiffs provided in-home support services to low income elderly and disabled persons, who received benefits to fund these services through a statewide public entitlement program. (RJN, Ex. F at p. 4.) By statute, the plaintiff providers were designated as state employees and were thereby subject to an exclusive bargaining agreement, which permitted the defendant union to collect agency fees. (*Id.* at pp. 1-2.) The plaintiffs asserted a constitutional challenge to the statute alleging that it violated the First Amendment rights of the providers and impinged upon their right to free association. (*Id.* at 2.) The union sought dismissal arguing that the statutory framework was enacted to clarify that the public body was the employer of the providers for collective bargaining purposes only and that the program recipients were the employers of the providers for all other purposes. (*Id.* at 15.) The union also argued that under *Hanson* and *Abood*, the union could constitutionally collect agency fees to

support the costs of collective bargaining. (*Id.* at 16-17.) The plaintiffs argued that the challenged statutory provisions constituted illegal content and viewpoint based regulations subject to strict scrutiny to be constitutional. (*Id.* at 18.) The plaintiffs further contended that no public employer-employee relationship existed to justify an exclusive bargaining arrangement and that any such justification must be the least restrictive means available. (*Id.* at 20.)

The district court concluded that the plaintiffs were incorrect about the standard of scrutiny that applies to collective bargaining agreements. The court explained that "[i]t has long been settled that such interference with First Amendment rights is justified by the governmental interest in industrial peace." (*Id.* at 21.) The court found that the statutory framework classifying the providers as public employees subject to exclusive bargaining agreements was in accordance with longstanding Supreme Court precedent. (*Id.* at 22.) The district court dismissed the plaintiffs' claims with prejudice and noted that the plaintiffs failed to articulate any impermissible way in which the statutory scheme impinged upon their First Amendment rights. (*Id.* at 22-23.)

Similarly, Plaintiffs have not alleged that the exclusive representation system here has imposed any burden on Plaintiffs beyond supporting the collective bargaining arrangement from which they benefit. There are no allegations that the fair share fees here are used to support any political or ideological activities. The Complaint alleges only that the Rehabilitation Plaintiffs pay a compulsory fee to SEIU HII for "their proportionate share of the costs of the collective bargaining process, contract administration and pursuing matters affecting wages, hours and other conditions of employment." (Dkt. No. 1 ¶ 25.) These costs are constitutional under

16

*Lehnert* and other longstanding Supreme Court precedent. The Complaint fails to state a plausible claim that the fair-share fee arrangement violates the First Amendment and thus the Court dismisses Count I with prejudice.

### B. Count II - Disabilities Plaintiffs

Count II, asserted on behalf of the Disabilities Plaintiffs, alleges that Defendants Governor Quinn, SEIU Local 73, and AFSCME have threatened to violate Plaintiffs' First Amendment rights by attempting to unionize the individual providers in the Disabilities Program. (Dkt. No. 1 pp. 16-17.) Defendants seek dismissal of Count II arguing that the Court lacks subject matter jurisdiction because the claim is not ripe and the Plaintiffs lack standing. (Dkt. No. 31 p. 33.) Plaintiffs counter that because the threat to their First Amendment rights is imminent, they have standing to enjoin enforcement of the statutory framework which would subject them to exclusive representation and fair share fees. (Dkt. No. 33 pp. 40-41.)

Article III of the U.S. Constitution limits the authority of the federal courts to "cases or controversies." From that requirement flow two closely related concepts: ripeness and standing. *Rock Energy Coop. v. Village of Rockton*, 614 F.3d 745, 748 (7th Cir. 2010). Both of these doctrines bar a plaintiff from asserting an injury that depends on so many future events that a judicial opinion would be advice about remote contingencies. *Id.* To determine whether an actual controversy exists, a court must look at whether the facts alleged show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant relief. *Rock Energy*, 614 F.3d at 748.

#### 1. Ripeness

Defendants argue that Count II is not ripe because there are several contingencies that

17

must occur, that are not certain to occur, before the individual providers in the Disabilities Program would be subject to a fair share arrangement. The Complaint alleges that the majority of individual providers in the Disabilities Program elected not to designate any union as their exclusive representative in October 2009. (Dkt. No. 1 ¶¶ 32, 36.) Plaintiffs have not alleged that another election has been scheduled or that either Defendant SEIU Local 73 or Defendant AFSCME has petitioned to hold such an election. Further, as the Defendants asserted, the Disabilities providers could once again choose not to be represented by a labor organization. Even allowing for an election designating some union as the exclusive representative, a collective bargaining agreement that included a fair share fee provision would then need to be negotiated. Furthermore, Defendants SEIU Local 73 and AFSCME may choose not to participate in an election if one were to be held. Notwithstanding Plaintiffs' argument that an election is likely, there are simply too many "future events that may not occur as anticipated, or indeed may not occur at all" to find that the threatened alleged violation is imminent, and thus ripe for adjudication. *Evers v. Astrue*, 536 F.3d 651, 662 (7th Cir. 2008). Count II is dismissed because the claim is not ripe.

### 2. Standing

Defendants argue that no plaintiff has standing to assert Count II for the same reason that the claim is not ripe. Plaintiffs counter that they have standing because they can show a "reasonable probability" of suffering tangible harm and that they have expended time and money to prevent "Defendants' attempts to impose a compulsory representative upon them in violation of their constitutional rights." (Dkt. No. 33. p. 42.)

The required elements of Article III standing are: (1) an injury-in-fact, which is an

invasion of a legally protected interest that is concrete and particularized and, thus, actual or imminent, not conjectural or hypothetical; (2) a causal relation between the injury and the challenged conduct, such that the injury can be fairly traced to the challenged action of the defendant; and (3) a likelihood that the injury will be redressed by a favorable decision. *Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 489 (7th Cir. 2004).

To satisfy the injury-in-fact requirement, the Disabilities Plaintiffs must establish that they have sustained or are immediately in danger of sustaining some direct injury. *Id.*; *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 528 (7th Cir. 2001). This the Plaintiffs cannot do. Plaintiffs have couched their claim as involving an injury that the Defendants are "threatening." (Dkt. No. 1 p. 16.) Thus, the alleged injury is not actual and, as discussed above, it is not imminent given the multiple contingencies that may or may not occur. The fact that the Disabilities Plaintiffs voluntarily spent money to prevent what they perceive as a threatened violation of their First Amendment rights does not establish an injury-in-fact. *See, e.g. Forbes v. Wells Fargo Bank, N.A.*, 420 F. Supp. 2d 1018, 1021 (D. Minn. 2006) (granting summary judgment where plaintiffs' "expenditure of time and money was not the result of any present injury, but rather the anticipation of future injury that has not materialized."). Having failed to establish an injury-in-fact, Plaintiffs cannot meet the remaining requirements necessary to establish standing.

The Court lacks subject matter jurisdiction over Count II because the claim is not ripe and Plaintiffs lack standing. As a result, the Court dismisses Count II against all Defendants

with prejudice.[4]

### C. Claims for Damages Against Governor Quinn

Defendants also move for dismissal of all claims against Defendant Governor Quinn that seek monetary relief on the ground that the Eleventh Amendment bars such claims. (Dkt. No. 31 p. 38.) Plaintiffs did not address this argument in their Opposition Motion. Since the Court has concluded that Counts I and II must be dismissed with prejudice, the Court need not reach the issue of sovereign immunity.

## IV. CONCLUSION

For the above stated reasons, this Court GRANTS Defendants' Consolidated Motion to Dismiss.

IT IS SO ORDERED.

Dated  November 12, 2010                     Hon. Sharon Johnson Coleman
                                             United States District Court

---

[4]To the extent that Defendants argue that Count II should be dismissed against SEIU Local 73 and AFSCME for lack of state action, the Court's ruling dismissing all Defendants from Count II renders this argument moot.